# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4651 | **DATE** | March 11, 2003 |
| **CASE TITLE** | *Sembos v. Philips Components* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, Defendant Philip Components' Motion for Summary Judgment [46-1] is GRANTED. In conjunction with this ruling, the Court also DENIES Defendant's Motion to Strike Improper Denials of Fact [43-1] and Plaintiff's Motion to Strike Affidavits [51-1].

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | U.S. DISTRICT COURT | date docketed | |
| | Docketing to mail notices. | CLERK MAR 1 8 2003 | | |
| | Mail AO 450 form. | 03 MAR 17 AM 11:06 | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED-ED 10 | | |
| RTS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ATHANASIOS SEMBOS,      )
     )
    **Plaintiff,**      )
     )    **Hon. Blanche M. Manning**
    **v.**      )
     )    **Case No. 00 C 4651**
PHILIPS COMPONENTS,      )
     )
    **Defendant.**      )

## MEMORANDUM AND ORDER

Plaintiff Athanasios Sembos ("Sembos") brought this action against Defendant Philips

Components ("PC") for age discrimination (Count I), in violation of the Age Discrimination

Employment Act ("ADEA"); breach of contract (Count II); and promissory estoppel (Count III).

The instant matter comes before the Court on PC's Motion for Summary Judgment, pursuant to

Federal Rule of Civil Procedure 56. For the following reasons, the motion is GRANTED as to

all three counts.

**DOCKETED**

MAR 1 8 2003

## BACKGROUND[1]

Sembos was an employee at PC from 1978 to 1999. (Sembos SOF ¶ 78.) Up until 1995,

Sembos held a number of sales and marketing positions at PC's manufacturing facility in South

Carolina. (PC SOF ¶ 7.) In 1997, PC transferred Sembos to its Chicago office to serve as district

sales manager. (Sembos SOF ¶ 89.) In 1998, PC promoted Sembos to the position of key

---

[1]     The facts in the Background section are derived from the parties' Local Rule 56.1 statements and other pleadings. The facts in PC's Local Rule 56.1(a)(3) statement that Sembos did not controvert in his Local Rule 56.1(b)(3)(A) statement are deemed admitted for purposes of this motion. Schultz v. Serfilco, Ltd., 965 F.2d 516, 519 (7th Cir. 1992). Likewise, the facts that Sembos provided in his Local Rule 56.1 statement that PC did not controvert are also deemed admitted. Id.

account manager, which entailed the sale of PC's passive components products. (PC SOF ¶¶ 6, 8.) Sembos continued working for the company until PC terminated his employment on August 21, 1999. (Sembos SOF ¶ 79.)

PC is one of several divisions of Phillips Electronics North America Corporation ("Phillips Electronics"). (PC SOF ¶ 3.) PC largely manufactures and sells passive components products for Phillips Electronics throughout the United States. (Id. ¶ 10.) Sembos' termination stems from PC's decision to sell a substantial portion of its passive components to Beyerschlag Centralab Components ("BCC") in September, 1998. (Id.) The sale, which had been officially announced during a meeting at PC's facility in San Jose, California, affected 65 to 70 percent of the products that Sembos sold for PC. (Id. ¶¶ 11, 12.)

After the announcement of the sale to BCC, PC sales executives Nigel Blakeway ("Blakeway") and Pino Corti ("Corti") approached Sembos after the meeting and offered him a position at BCC. (Id. ¶ 12.) Sembos told the executives that he would work at BCC only if they could ensure that his pension benefits with PC would remain intact. (Sembos SOF ¶ 108.) Sembos argues that, in October 1998, Blakeway and Corti guaranteed that his BCC pension plan would be identical to the one he held at PC. (Id. SOF ¶ 113.) Sembos also claims that the executives promised him continued employment with PC if he believed that the PC and BCC pensions plans would not be similar. (Id. ¶ 109.) After this discussion, Sembos participated in several phone conversations and e-mail discussions with Corti and other PC personnel regarding the future of his pension benefits. (Id.)

On December 13, 1998, Sembos discovered that BCC did not have a pension plan with benefits equal to that of PC. (PC SOF ¶ 27.) Therefore, he decided to wait until January 11,

2

1999, for PC and BCC to allow him to take part in a BCC pension plan identical to the one he had with PC. (Id. ¶ 28.) Arrangements between the two companies proved to be unsuccessful, however, and Sembos officially declined the position with BCC on January 11, 1999. (Id. ¶ 29.)

Sembos then exercised Corti's and Blakeway's alleged promise that he could continue his employment with PC. (Sembos SOF ¶ 122.) Discussions between PC and BCC management ensued. (PC SOF ¶ 35.) Then, in February 1, 1999, Sembos received an e-mail from Karen Adamski ("Adamski"), a PC human resource manager, that highlighted the arrangement PC and BCC had reached regarding Sembos' future employment. (Id. ¶ 37.) Adamski's e-mail stated that Sembos would work under PC but "be on loan" to BCC, who would then pay Sembos' compensation directly through PC. (Id.) The e-mail further stated that this arrangement would only be for six months. (Id.) In the meantime, PC would actively look for other positions that Sembos could pursue within PC. (Id.) PC reserved the right to terminate Sembos' employment if, after the six-month transitional period, he had been unable to find a new position anywhere within the company. (Id.)

Some time after he received the February 1, 1999 e-mail, Sembos submitted a resume to PC's human resource department so that it could begin to look for other positions that would potentially suit Sembos. (Sembos SOF ¶ 142.) On June 16, 1999, Bob Akers ("Akers"), an independent recruiter for PC, sent Sembos a list of 23 available positions at PC's facility in San Jose, California. (PC SOF ¶ 51.) The next day, Sembos responded by e-mailing Akers a request for more information regarding eight of the positions on the list. (Id. ¶ 54.) Although Sembos expressed his interest in these positions to Akers, Sembos claims that he did not further pursue any of them because Akers had told him that he was either under or over qualified for these

positions. (Id. ¶ 55.) Sembos never accepted nor had been offered a position at PC before the

six-month transitional period. (Id. ¶ 64.) Therefore, pursuant to the terms of the transitional

agreement set forth in the February 1, 1999 e-mail, PC terminated Sembos' employment at the

end of six months. (Id. ¶ 65.)

On January 27, 2000, Sembos filed a charge of age discrimination with the Equal

Employment Opportunity Commission ("EEOC"). (Am. Compl. at ¶ 6.) After receiving a right

to sue letter from the EEOC, in July 2000, Sembos filed this action against PC alleging age

discrimination in violation of the ADEA. In April 2001, Sembos amended his complaint to

include state law claims for breach of contract and promissory estoppel. After the conclusion of

discovery, PC brought the instant motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23; Cheek v.

Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A genuine issue of material

fact is one that might affect the outcome of the lawsuit, and factual disputes that are irrelevant

will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In

determining whether a genuine issue of material fact exists, the court must construe the alleged

facts in a light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S.

654, 655 (1962); Dale v. Chicago Tribune Co., 797 F.2d 458, 460 (7th Cir. 1986).

The moving party carries the initial burden of establishing that no genuine issue of

material fact exists. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tennenbaum Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party must do more than "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and may not merely rest upon the allegations or denials in its pleading, but instead must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. Id. at 250-51 (citations omitted). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the nonmoving party. Regner v. City of Chicago, 789 F.2d 534, 536 (7th Cir. 1986).

Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993); McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 370-71 (7th Cir. 1992). Summary judgment is inappropriate if the court must balance conflicting indications of motive and intent. Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 97 (7th Cir. 1985). An employer can only prevail at the summary judgment stage if the record shows that a reasonable trier of fact must conclude that the employment decision was not based on discrimination. Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 893-94 (7th Cir. 1996).

## ANALYSIS

PC contends that this Court should grant summary judgment because: (I) Sembos has failed to establish a prima facie case that PC discriminated against him based on his age in violation of the ADEA; and (II) Sembos' state law claims for breach of contract and promissory estoppel are preempted by the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) ("ERISA"), and even if the claims are not preempted, Sembos failed to enter into a valid and enforceable contract with PC. The Court will discuss each of these contentions in turn.

## I.    ADEA Claim

The ADEA prohibits employers from discriminating against employees, who are over 40 years of age, based on the employees' age, 29 U.S.C. § 631(a), with respect to compensation, terms, conditions, or privileges of employment. Id. at § 623(a). To maintain a claim under the ADEA, employees must establish that they would not have suffered adverse treatment "but for" the employer's motive to discriminate based on the employees' age. Taylor v. Canteen Corp., 69 F.3d 773, 779 (7th Cir. 1995). To make a showing of discrimination to defeat a motion for summary judgment, a plaintiff may either present direct or indirect evidence of age discrimination. Id.

Under the direct method, the plaintiff may show that the employer's decision to take the adverse employment action was motivated by an impermissible purpose, such as age. Pafford v. Herman, 148 F.3d 658, 665 (7th Cir.1998); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.1994). Direct evidence is the type that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents. Troupe, 20 F.3d at 736. There are three

6

methods to indirectly prove discriminatory intent: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected groups, and other bits and pieces from which an inference of discriminatory intent might be drawn. Troupe, 20 F.3d 734; (2) "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic on which an employer is forbidden to base a difference in treatment, received systematically better treatment"; or (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason is unworthy of belief, a mere pretext for discrimination," Id., citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-08 (1993).

Direct evidence of discriminatory intent can be found where the decision maker makes a derogatory remark concerning the plaintiff's protected class, i.e., "don't hire her because she is black.." See, e.g., Mojica v. Gannett, 7 F.3d 552, 561 (7th Cir.1993). A decision maker's derogatory age-based statement is probative of intentional discrimination if it: (1) is made or relied upon by the decision maker, Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1266 (7th Cir. 1993); (2) related to the employment decision at issue, Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993); and (3) is close in time to the employment decision. Id.

Because Sembos has not put forth any direct evidence of age discrimination, this Court will apply the indirect burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sirvidas v. Commonwealth Edison Co., 60 F.3d 375, 377 (7th Cir. 1995); Schultz v. General Elec. Capital Corp., 37 F.3d 329, 333 (7th Cir. 1994). Under this method, a plaintiff must first establish a prima facie case of age discrimination by showing that:

(1) she was a member of the protected age group; (2) she was performing to her employer's legitimate expectations; (3) she was subject to a materially adverse employment actions; and (4) younger employees were treated more favorably.[2] Sirvidas, 60 F.3d at 377.

The parties here contest whether this is a case of failure to hire or failure to transfer. This contention is irrelevant in determining what constitutes a prima facie case here. The two standards are essentially the same. To establish a prima facie case in a failure to hire due to age discrimination, the plaintiff must show that: (1) she was a member of the protected class (over 40 years of age); (2) the employer was seeking applications for a position for which the plaintiff applied and was qualified for; (3) she was not hired; and (4) a younger person who was similarly or less qualified than the plaintiff was hired. Kralman v. Ill. Dept. of Veterans' Affairs, 23 F.3d 150, 153 (7th Cir. 1994); Caldwell v. Nat'l Ass'n of Home Builders, 771 F.2d 1051, 1056 n.2 (7th Cir. 1985). In a failure to transfer or promote case, the standard is the same except that the plaintiff must present evidence that the employer was seeking applicants for transfer and that the employee applied for and was qualified for the position but a younger employee, who was similarly or less qualified, got the job. See Pafford v. Herman, 148 F.3d 658, 669 (7th Cir. 1998).

Once made, the prima facie case creates a rebuttable presumption of discrimination, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for failing to promote the plaintiff. Taylor, 69 F.3d at 779. If the employer articulates a

---

[2]     In contesting a motion for summary judgment, the plaintiff need not establish proof which would allow her to prevail on the merits, only that there is a genuine issue of material fact with regard to each element. See Lindsey v. Baxter 1267 Healthcare Corp., 757 F.Supp. 888, 893 n.9 (N.D. Ill.1991).

nondiscriminatory rationale for the employment decision, the burden of production shifts back to the plaintiff to prove that the rationale is a pretext, i.e. a lie, sham, phony explanation, which masks the employer's intentional discriminatory animus. Id. at 779-80. The plaintiff can demonstrate a pretext by producing direct or circumstantial evidence indicating that the decision was motivated by discriminatory animus or "is unworthy of credence." Rand v. CF Indus., 42 F.3d 1139, 1145 (7th Cir.1994).

In the case of a reduction in force ("RIF"), the ADEA does not require the employer to "establish an interdepartmental transfer program." Taylor, 69 F.3d at 80. Likewise, the employer does not have a duty to transfer an employee when it reduces its work force. Id. When implementing an RIF, however, the employer cannot provide new jobs or assistance in finding new jobs only to younger employees and not to older employees. Id.

Here, PC contends that Sembos has failed to establish his ADEA claim because Sembos has failed to present evidence that: (A) he applied for any open positions within PC for which he was qualified; (B) PC hired younger applicants who were less or similarly qualified as Sembos; and (C) even if Sembos established a prima facie case, he has not shown that PC's legitimate proffered reason for not hiring him was pretextual.

A.    **Applied for a Position Which Qualified For**

PC contends that Sembos has failed to establish a prima facie case because he has not shown evidence that he applied for any open positions within PC for which he was qualified for.

In determining whether an employee applied for a job, the court must first examine how the employer hires, promotes, and transfers employees. See Loyd v. Phillips Bros., Inc., 25 F.3d 518, 523 (7th Cir. 1994). If the employer had a "formal system of posting job openings and

allowing employees to apply for them," then the employee's failure to apply for the open position "would prevent her from establishing a prima facie case." Box v. A&P Tea Co., 772 F.2d 1372, 1376(7th Cir. 1985). If, however, the employer does not post applications but instead seeks out applicants through an informal system, the employee can make a prima facie case by showing that had she known of the open position, she would have applied for the position. Id. at 1376-77; Loyd, 25 F.3d at 523.

To show that the she would have applied for the position had she known of it, the employee must show more than a "vague interest" in the position for which she was allegedly precluded from obtaining based on a discriminatory animus. Box, 772 F.2d at 1377. The employee must show that she "explicitly expressed her desire" to be hired or transferred. Elguindy v. Commonwealth Edison Co., 903 F. Supp. 1260, 1267 (N.D. Ill. 1995). This desire may be established by showing that the employee made "informal inquiries" about being considered for a certain position or positions. Mathis v. Pete Georges Chevrolet, Inc., 1998 WL 102526, at *2 (N.D. Ill. Feb. 20,1998) (Williams, J.); Kastel v. Winnetka Bd. of Ed., Dist. 36, 946 F. Supp. 1329, 1334 (N.D. Ill. 1996).

In Box, 772 F.2d at 1376, the employee alleged that her employer discriminated against her by failing to transfer/promote her into an assistant manager position. To show that she would have applied for the assistant manager position had she known of it, she presented evidence that she told her employer that she had requested training so that "she could move up . . . [to] bookkeeper, assistant manager, whatever." Id. at 1377. In affirming the district court's grant of summary judgment in favor of the employer, the Seventh Circuit held that the employee failed to establish a prima facie case because she only showed a "vague interest" in the position for which

she alleged she was discriminated in obtaining. Id.

In contrast to Box, in Elguindy, 903 F. Supp. at 1267, in denying summary judgment for the employer, the court held that the employee "explicitly expressed her desire to be promoted" into the position for which she alleged she applied for but did not receive due to discrimination. Although the employer did not post open positions, the employee expressed her desire to be promoted "both in writing and orally." Id. Likewise, in Mathis, 1998 WL 102526, at * 2, in denying the employer's motion to dismiss, the court held that the employee's request to his "direct supervisor" to be considered for an assistant manager position constituted a sufficient interest to establish a prima facie case.

Here, PC asserts that when a position becomes open, the hiring manager forwards the job description to human resources ("HR") who then places it on PC's intranet site on the "local job posting site."[3] (Chrisman Dep. at 21-22.) However, during the relevant time period, "the site was not fully functional, so [HR] tended not to use it." (Id.) Employees of PC were able to transfer within the company by talking to HR. (Adamski Dep. at 16-17.) HR would then inform the interested employee of the open positions either verbally or by e-mail. (Id. at 18.) Open positions were also filled by independent contractors, who worked as recruiters for PC, and were alerted to open positions by individual managers. (Id.)

To apply for an open position, a current PC employee would then need to submit a resume but generally not an application. (Chrisman Dep. at 30.) Therefore, once a current employee submitted a resume for an open position and specifically stated the position in which he was interested, he was considered by PC to have applied for that position. (Id. at 30, 245.)

---

[3]     There was not an internet posting site for PC. (Adamski Dep. at 16.)

The PC employee could properly submit a resume for consideration to either the hiring manager, HR, or the independent recruiter. (Id. at 245.)

On June 16, 1999, Bob Akers, an independent recruiter for PC, sent Sembos a list of 23 open positions for PC in San Jose, California. (PC SOF, Ex. 13.) In response, on June 17, 1999, Sembos sent Akers an e-mail stating his interest and requesting additional information in eight of the positions on the June 16, 1999 list. (Id. at Ex. 14.) Sembos believed that he had applied for the eight open positions because HR and Akers had his resume and knew of his interest in these particular positions.[4] (Sembos Dep. at 276.) Sembos, however, testified that he did not take any further actions to apply for any of the positions for which he expressed an interest because Akers allegedly told him he was either under or over qualified for these positions. (Id.)

Based on the above, it would appear that under PC's own policy, Sembos properly applied for the eight positions in the June 16, 1999 list by submitting his resume to Akers and HR and then expressing a clear interest in these eight specific jobs in his June 17, 1999 e-mail to Akers and HR. Therefore, based on PC's policy and the above cases law, it appears that Sembos has put forth sufficient evidence to show that he applied for specific positions within PC.

This finding, however, does not end the inquiry. Sembos must show not only that he applied for the open positions but that he was qualified for those positions. Holder v. Old Ben Coal Co., 618 F.2d 1198, 1201-02 (7th Cir. 1980). In filling skilled positions, employers are entitled to only hire the most qualified applicant. Mason v. Continental Ill. Nat'l Bank, 704 F.2d 361, 364-65 (7th Cir. 1983). Thus, an employer does not violate the law by refusing to hire an

---

[4]     Sembos' belief would appear consistent with PC policy. Phillis Chrisman, an HR employee, testified that current PC employees could properly submit a resume for consideration to either the hiring manager, HR, or the independent recruiter. (Chrisman Dep. at 245.)

unqualified employee in favor of hiring or waiting to hire a sufficiently qualified applicant. Holder, 618 F.2d at 1201-02.

In determining whether the applicant was qualified for the open position, the employee's appraisal of his own qualifications has no evidentiary value. Rabinowitz v. Pen, 89 F.3d 482, 487 (7th Cir. 1996); Dey v. Colt Constr. & Dev., 28 F.3d 1446, 1460 (7th Cir. 1994). Instead, in determining if the applicant was qualified, the court should examine whether the employer hired any applicants with comparable experience for the position applied for or similar positions. Holder, 618 F.2d at 1202. The court should also compare the employer's written objective job description with the plaintiff's resume and determine if the plaintiff's education, skills, and experience were similar to the job description which would enable the plaintiff to perform the job's requirements. See Pafford v. Herman, 148 F.3d 658, 669 (7th Cir. 1998); Jennings v. Nat'l R.R. Passenger Corp., 1998 WL 460270, at *5-12 (N.D. Ill. July 30, 1998); Driver v. Ill. Central Gulf R.R., 1989 WL 8577, at *2 (N.D. Ill. Jan. 30, 1989).

Here, Sembos' only evidence that he was qualified for the eight positions that he applied for is his own subjective opinion that he "may" have been qualified (Sembos Dep. at 271), which as stated above has no evidentiary value. Moreover, Sembos testified that he had not seen PC's written job descriptions for the eight positions (id. at 277), which to the extent they are available (PC asserts that two of the eight job descriptions are unavailable) have been produced in this case (see PC SOF, Ex. 15) but have not been attached to either parties' Rule 56.1 statements. He based his opinion solely on his subjective understanding of his own skills without consideration as to the specific requirements of these eight jobs.

In contrast to Sembos, PC has put forth evidence showing that he was not qualified for

the eight jobs which Sembos applied for at PC in San Jose. According to Akers, the jobs in San Jose "required very highly qualified people with certain skill sets, and those skill sets involved either knowing the flat display world or having some reasonable technical experience with embedded software or ACIX design. Al didn't have those." (Akers Dep. at 50.) Similarly, two of the hiring managers for two of the positions which Sembos applied for stated that Sembos was not qualified for the two positions. (PC SOF, Exs. 16-17.) After reviewing Sembos' resume, Joep van Beurden, who was the hiring manager for the Director of Application Development position for which Sembos applied, stated that this job required several key skills in areas which Sembos did not have any experience, such as the AMLDC screen industry. Beurden noted that Sembos' primary experience was in sales and marketing which were not part of the job function of the Director of Application Development. (Id.) Likewise, Wan Chang, who was the hiring manager for the E-Commerce Business position for which Sembos applied, stated that the position required experience in information technology and project management. (Id.) After reviewing Sembos' resume, Chang noted that Sembos had no background in technology and that his experience in sales and marketing were not applicable to this position. (Id.)

Consequently, other than Sembos' self-serving assessment of his skills, which are not of any evidentiary value, this Court finds that Sembos has failed to show that he was qualified for the eight positions for which he applied, and therefore, has failed to establish a prima facie case.

## B.     Hired Younger Applicants Who Were Less or Similarly Qualified

PC additionally contends that Sembos has not established a prima facie case because he

has failed to put forth sufficient facts to show that PC hired younger applicants for the positions

he applied for who were less or similarly qualified than himself.  Sembos admitted that he did not

know if any of the eight positions were filled by younger employees who were similarly

qualified.  In contrast, PC has presented uncontested evidence which shows that no one was ever

hired for five of the eight positions, and thus, could not have been filed by a younger similarly

qualified person.  Of the three remaining positions, PC submitted affidavits from its hiring

managers stating that while the persons hired for these positions were under 40 years of age, they

possessed the unique set of skills, which Sembos did not have, that were required to properly

perform the positions.  Accordingly, this Court finds that Sembos has failed to show that PC

hired younger applicants for the positions he applied for who were less or similarly qualified than

himself, and therefore, has failed to establish a prima facie case.

Consequently, even construing the facts in Sembos' favor, as the Court is required to do,

the Court finds that Sembos has failed to present sufficient evidence to establish a prima facie

case of age discrimination, and thus GRANTS PC's motion for summary judgment as to Count I.

## II.     State Law Claims

PC has also moved for summary judgment of Sembos' claims for breach of contract

(Count II) and promissory estoppel (Count III) on the grounds that they are preempted by federal

law.

Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  In construing ERISA's

15

preemption language, the Supreme Court has held that a court shall enforce Section 514(a) when its "inquiry must be directed to the plan" or when a plaintiff's cause of action "conflicts directly with ERISA." Ingersoll-Rand, Co. v. McClendon, 498 U.S. 133, 139 (1990). The Court has further determined that a state law may "relate to" an ERISA plan, and thus, be preempted, even if such law is of general application and has only an indirect effect on such plans. Shaw v. Delta Air Lines, 463 U.S. 85, 98 (1983) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987)).

The Supreme Court has emphasized the "deliberately expansive" nature of ERISA's preemption language. Pilot Life, 481 U.S. at 46. It has been well settled that Section 514(a) is designed to establish pension plan regulation as exclusively a federal concern. Id. In fact, the Court has held that ERISA preempts all state law "within its sphere," even those that are consistent with its "substantive requirements." Metropolitan Life Ins. Co. v. Mass., 471 U.S. 724, 739 (1985). Echoing the Supreme Court's sentiments, the federal circuit courts have also noted the minimal extent to which state law can reach beyond the scope of Section 514(a). Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1294 (5th Cir. 1989) (citing Jackson v. Martin Marietta Corp., 805 F.2d 1498, 1499 (11th Cir. 1986)). Considering the breadth of ERISA's preemption language, Congress has essentially "blotted out (almost) all state law on the subject of pensions." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1075 (7th Cir. 1992). Thus, any cause of action that relates to pensions rests on federal law, irrespective of the label its author attaches and is considered "federal litigation at the defendant's option." Id.

If the plaintiff's complaint alleges a common law breach of contract claim, such a claim "is really based on ERISA if the contract in question is a pension plan." Id. Aside from pension and welfare plans, contracts specifying levels of pension and welfare benefits also fall into the

16

domain of federal law – for the plans themselves are just contracts. <u>Dranchuck v. Akzo Nobel, Inc.</u>, 88 F.3d 457, 459 (7th Cir. 1996). Therefore, any action by an employee against the employer for ERISA benefits will be based on the specific provisions of the pension plan, and therefore, preempted by Section 514(a). <u>Tolle v. Carroll Touch, Inc.</u>, 977 F.2d 1129, 1137 (7th Cir. 1992).

The Supreme Court has set forth a two-part test to determine whether a state law resting on a plaintiff's claims "relates to" an employee benefit plan, thereby preempting the plaintiff's state law claims. <u>Metropolitan Life Ins. Co. v. Johnson</u>, 297 F.3d 558, 564 (7th Cir. 2002). The Court held that a state law "relates to" an ERISA plan if it has a connection with or reference to such a plan. <u>Ingersoll-Rand</u>, 498 U.S. at 139. The Court has further explained that a state law refers to an ERISA plan where it "acts immediately and exclusively upon ERISA plans" or "where the existence of an ERISA plan is essential to the law's operation." <u>California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.</u>, 519 U.S. 316, 325 (1997). This Court will examine the Supreme Court's two-part test as it relates to Sembos' breach of contract and promissory estoppel claims.

First, however, this Court will attempt to reconcile the conflicting cases that each party addresses as to whether Sembos' state law claims are preempted by ERISA because he seeks damages for lost pension benefits. In connection with his claims for breach of contract and promissory estoppel, Sembos seeks compensatory damages in the form of lost wages, pension benefits, and other benefits, including healthcare benefits. (Sembos Am. Comp. at ¶ 32.) In addressing whether ERISA preempts Sembos' state law claims, this Court will examine these claims as they relate to: (A) lost pension benefits; and (B) loss of wages and other benefits.

## A.    Pension Benefits

Sembos argues that his damages for lost pension benefits that arise from his state law claims do not implicate PC's ERISA plan. In support of his argument, Sembos relies on the Fourth Circuit's holding in Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir. 1989). In Pizlo, the plaintiffs brought breach of contract and promissory estoppel claims seeking compensatory damages for lost wages and pension, health, life, and disability benefits as a result of their employer's alleged breach of a promise regarding early retirement and pension benefits. Id. at 120. The plaintiffs alleged that the employer made certain promises regarding pension benefits to entice workers not to take early retirement. Id. at 117. Relying on this promise, the plaintiffs accepted this offer and worked until they retired at age 62. Id. Two and one-half years after accepting this offer and continuing to work, the employer announced that it would not pay the additional benefits which it had earlier promised. Id.

Reversing the dismissal of state law claims on preemption grounds, the Fourth Circuit reasoned that the plaintiffs' claims did not revolve around their eligibility for plan benefits but whether the amount of benefits to which they would have been entitled "had the alleged contract to work until age 62 not have been breached." Id. at 120-21. If the plaintiff were to succeed on his claims, the court held that, although damages would be assessed in part on lost pension benefits, the pension trust would not be liable and the plan administrators would not be burdened in any way. Id. Therefore, the court determined that the plaintiff's state law claims did not relate to an ERISA plan and therefore were not preempted. Id. at 121.

Sembos further directs this Court's attention to Klank v. Sears Roebuck & Co., 735 F. Supp. 260 (N.D. Ill. 1990). In Klank, the plaintiff brought an action for breach of contract,

promissory estoppel, and negligent misrepresentation, alleging that he had been misled when his former employer failed to inform him of an additional severance package, which was disclosed to employees a day after the plaintiff resigned from the company with the normal benefits. Id. at 263. The Court noted that it would have to refer to the unannounced severance package to ascertain the plaintiff's measure of damages if he was to prevail in his suit. Id. at 263. However, in following Pizlo, the court in Klank held that reference to an ERISA plan to compute the plaintiff's damages "does not at all equate with bringing him within the scope of the statutory action." Id. at 263-64.

PC, on the other hand, cites to the Fifth Circuit's holding in Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1294 (5th Cir. 1989) and the First Circuit's finding in Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790 (1st Cir. 1995). In Cefalu, the employer advised the plaintiff that he would be terminated in three months as a result of the sale of his division to a third party. Cefalu, 871 F.2d at 1291. The employer offered the plaintiff a number of employment options to pursue, one being the opportunity to purchase a franchise. Id. at 1292. When the plaintiff exercised this option, he alleged that his former employer orally assured him that his retirement benefits as a franchisee would be identical to those of employees who had accepted jobs with the new owner. Id. When the employer advised the plaintiff that his benefits would not be the same, the plaintiff bought a breach of contract claim. Id. The plaintiff argued that he was merely seeking recovery from his employer pursuant to the oral agreement unrelated to the ERISA plan and not seeking coverage under a pension plan. Id.

Likewise in Carlo, the employer made an error in computing the amount of the plaintiff's pension benefits in offering the plaintiff early retirement. 49 F.3d at 792. After discovering this

error, the plaintiff learned that his early retirement benefits would be 20% less than anticipated. Id. After discovering this mistake, the employer offered to let the plaintiff continue his employment with the company or accept his early retirement option with the decreased benefits. Id. After the plaintiff took early retirement, under protest, he brought a state law claim for breach of contract. Id. In contesting preemption, the plaintiff claimed that he only sought damages sustained as a result of his employer's alleged misrepresentation under the plan - not coverage under the plan. Id. at 793. The plaintiff further contended that, because he sued only his employer and not the pension trust, any damages award would not affect the "fiscal integrity" of the ERISA plan. Id.

Both circuits developed nearly identical reasoning to hold that the plaintiffs' state law claims were preempted by ERISA. Cefalu, 871 F.2d at 1294; Carlo, 49 F.3d at 794. Relying primarily on the Supreme Court's two-part test, both courts ruled that the state law claims had "a connection with or reference to" employee benefit plans. Id. Cefalu and Carlo reasoned that, if the plaintiffs had been successful in their suits, the courts would have no choice but to refer to the plan to compute the proper amount of damages. Id. The courts determined that the damages in relation to the plaintiffs' lost pension benefits had been created by their respective ERISA plans, and therefore, depended on an analysis of the provisions of such plans. Id. The courts stated that to use any other source as a measure of damages would force them to speculate on the proper amount to award. Id. Therefore, even though the plaintiffs contended that they were merely seeking recovery based on a breach of an employment contract by the employer, not damages under a pension plan, both courts rejected these arguments and held that ERISA preempted the state law claims.

The Seventh Circuit has not yet addressed the issue of whether damages based on lost pension benefits are preempted by ERISA because the court would be required to refer to the pension plan to compute damages. PC argues, however, that the conclusions reached by the Seventh Circuit in Dranchuk v. Akzo Nobel, Inc., 88 F.3d 457, 459 (7th Cir. 1996) are controlling. In Dranchuk, the employer promised the plaintiff a continuation of wages, extra pension credits, unreduced payments in the event of early retirement. Id. at 459. These promises took the form of three letter agreements. Id. When the employer did not fulfill its promises, the plaintiff brought an action for age discrimination and breach of contract. Id. Relying on Cefaul, 871 F.2d at 1296, discussed above, the court in Dranchuk found that the letter agreements related to the ERISA plan because they instruct the plan's administrator how much to disburse to the plaintiff from the pension and welfare trusts. Id. The court reasoned that, to afford the plaintiff the appropriate remedy, the employer would have to contact the pension plan's administrator, who would then have to calculate what the plaintiff would be due under the terms of the plan – "precisely why the letter agreements are covered by ERISA rather than state law." Id.

This Court finds that the holdings in Dranchuk, Cefalu and Carlo control the instant case, and therefore, holds that Sembos' state law claims as they relate to his damages for lost pension benefits are preempted by ERISA. If Sembos prevailed on his state law claims, his damages would mainly consist of the pension benefits that he would have received under the ERISA plan if he had continued his employment with PC. To compute these damages, this Court would be required to refer to Sembos' pension plan at PC and to his present plan with his current employer. As in Dranchuk, Cefalu and Carlo, PC would be instructed to seek out the plan administrator, who would have to unavoidably refer to the intricacies of Sembos' plan to ensure

21

that he received the appropriate amount of damages. See Dranchuk, 88 F.3d at 459. Thus,

Sembos' attempt to enforce his rights to lost pension benefits is preempted by Section 514(a).

See Anderson v. Morrell & Co., 830 F.2d 872, 875 (8th Cir. 1987) (state law is clearly preempted

in an action to recover benefits, or to enforce or clarify rights to future benefits, under the terms

of a plan).

Sembos contends that Dranchuk is still distinguishable from this case because his state

law claims relate to PC's alleged agreement to continue his employment with the company and

actively "find employment for him within Phillips [Electronics]." However, Sembos' claim for

breach of contract and promissory estoppel directly implicate his pension plan because the

continuance of his already existing plan had been the sole basis for PC's agreement to continue

his employment and find him a new position with the company. In his Amended Complaint,

Sembos alleges that he "turned down the job offer with BCC" to continue to work for PC "so that

his pension benefits and other benefits including healthcare would remain intact." (Am. Compl.

at ¶ 29.) Simply, the survival of Sembos' pension plan had been the very reason that PC

allegedly made these agreements.

Sembos also argues that this case is merely a measure of damages as a result of PC's

alleged breach of contract for continued employment. However, this argument mirrors the

contention that the plaintiffs made in Dranchuk, Cefalu and Carlo in regards to the issue of

ERISA preemption as it relates to damages for lost pension benefits. And, as Dranchuk points

out, this measure of damages must come from the provisions of the ERISA plan so that the

proper amount of damages for lost pension benefits can be assessed. See Dranchuk, 88 F.3d at

459. Here, Sembos seeks damages for his termination including the loss of "pension benefits."

(Am. Compl. at ¶ 32.)

### B.    Wages and Other Benefits

Sembos also alleges that he suffered a loss of wages and other benefits, including healthcare benefits, as a result of PC's breach of its agreement.  (Am. Compl. at ¶ 32.)  Dranchuk further aids this Court in determining whether Sembos' claims as they related to his loss of wages and other benefits also relate to his ERISA plan.  Aside from the portions of the letter agreements that related to ERISA plans, the plaintiff in Dranchuk attempted to also enforce, under state law, the portions that dealt with salary continuation and favorable recommendations.  Dranchuk, 88 F.3d at 459.  The Seventh Circuit ruled that these portions of the agreements that were not preempted by ERISA could not be "sensibly divorced" from the portions that related to pensions and welfare benefits.  Id.  Therefore, because the letter agreements affected ERISA plans and rested on Illinois law, the promises that they contained had to "stand or fall together under federal common law."  Id. at 459-60.

Here, similar to the plaintiff in Dranchuk, Sembos alleges that his damages for lost wages and other benefits arise from PC's alleged breach of its agreements to continue his employment and actively find a position for him within the company.  (Am. Compl. at 6-8).  Both of these agreements - Corti and Blakeway's oral promise in October, 1998 and Adamski's February, 1999 email - affect Sembos' ERISA plan and rest on state law because both agreements had been made solely for the purpose of preserving his pension benefits.  PC's alleged breach of the promises set forth in these agreements form the basis of Sembos' state law claims as they relate not only to his damages for lost pension benefits but also his damages for lost wages and other benefits.  Therefore, applying the reasoning in Dranchuk, this Court finds that Sembos' damages for lost

wages and other benefits, including healthcare benefits, must fall together with his damages for

lost pension benefits. See Dranchuk, 88 F.3d at 459-60.

Finally, keeping in mind the cases discussed above, this Court finds that Sembos' state

law claims also meet the Supreme Court's two-part test set forth in Ingersoll-Rand. Sembos

claims that PC agreed to continue his employment with the company if BCC did not agree to

maintain his pension benefits. (Am. Compl. at ¶ 27.) Sembos also alleges that PC breached its

agreement to actively find employment for him within the company so that his pension benefits

would remain intact. (Id. at ¶ 29.) Sembos' damages that arise from PC's alleged breach of

these promises are not only connected to his employee benefit plan but form the basis of an

ERISA claim. Ingersoll-Rand, 498 U.S. at 139; see Phillips v. Amoco Oil Co., 799 F.2d 1464,

1470 (11th Cir. 1986) (plaintiff's request for damages demonstrates that employees' claim not

only relates to an employee benefit plan but "is at its core an ERISA claim"). Because Sembos'

state law claims would necessarily require this Court to assess how much he should be paid

pursuant to the pension plan, the existence of his ERISA plan with PC would be essential to the

operation of Illinois law. See Dillingham, 519 U.S. 316, 325 (1997).

Consequently, this Court finds that Sembos' claims for breach of contract and promissory

estoppel relate to an employee benefit plan, and therefore, are preempted by ERISA. This Court

thus GRANTS PC's motion for summary judgment as to Count II and Count III.[5]

---

[5] Because this Court finds that Sembos' state law claims are preempted, it need not address
PC's alternative argument that Sembos failed to enter into a valid and enforceable contract

## CONCLUSION

For the foregoing reasons, Defendant Philip Components' Motion for Summary Judgment [46-1] is GRANTED. In conjunction with this ruling, the Court also DENIES Defendant's Motion to Strike Improper Denials of Fact [43-1] and Plaintiff's Motion to Strike Affidavits [51-1].

ENTER

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: 3-11-03